A99A0065. ST. JOSEPH'S HOSPITAL, INC. v. THUNDERBOLT
HEALTH CARE, INC.
A99A0066. STATE HEALTH PLANNING AGENCY
v. THUNDERBOLT HEALTH CARE, INC.
(517 SE2d 334)

BEASLEY, Presiding Judge.

In two separate appeals, St. Joseph's Hospital and the State Health Planning Agency ("SHPA") challenge the decision of the Superior Court of Twiggs County which reversed a final decision of the State Health Planning Review Board awarding a certificate of need ("CON") to St. Joseph's for an 11-bed nursing facility in Chatham County. The Review Board had upheld a hearing officer's findings of fact and conclusions of law entered after a formal hearing. The superior court ruled in favor of Thunderbolt Health Care, whose CON application had been denied, and held that the Review Board's decision "was improper." The cases are consolidated for this appeal.

The advent of subacute care, a new way of providing medical care, was occurring in Georgia when St. Joseph's, Thunderbolt and Candler Hospital, Inc. (no longer a party) applied to SHPA for CONs to add 11 beds to their respective facilities. Their applications were triggered by a projected unmet need for 11 nursing home beds in Chatham County by 1998. The projected need was based on a calculation provided in former SHPA Rule 272-2-.09 (9) (b) 1. which allowed 47 "nursing home beds" per 1,000 projected civilian non-institutional population age 65 or older in Chatham County.[1]

In response to notice of the unmet need, St. Joseph's submitted an application to provide 11 beds by converting 13 general acute care hospital beds into 11 skilled nursing beds. The principal purpose of the conversion was to offer what St. Joseph's categorized as "subacute care" in a skilled nursing unit to be located within the hospital. At the same time, Thunderbolt submitted an application to add 11 beds to its traditional nursing home which at that time was under construction in Chatham County.

---

[1] See also OCGA § 31-6-40.1 (b): SHPA may limit applications for skilled nursing facilities, intermediate care facilities, and home health agencies to only such time as it has determined there is an unmet need for such facilities; it shall notify those so requesting of any unmet need. The need was published.

On July 19, 1995, after a comparative review of each of the three applicants, SHPA awarded a CON for the 11 beds. to St. Joseph's. Thunderbolt requested an administrative appeal before the SHPA Review Board, contesting denial of its application and the award to St. Joseph's. Following an administrative hearing on May 30, 1996, the Review Board hearing officer issued 24 findings of fact and 26 conclusions of law upholding SHPA's award of the CON to St. Joseph's. Six months later the Review Board affirmed and adopted the hearing officer's findings and conclusions as its final decision. Thunderbolt petitioned Twiggs Superior Court for judicial review.

Thunderbolt essentially asserted that short-term, subacute care, skilled nursing beds offered by St. Joseph's did not meet the calculated unmet need for "nursing home beds" as defined in the rules. Thunderbolt contends that comparing different types of applications was an abuse of discretion, and that its application should have been considered on its own for a determination of whether it was entitled to the CON. Accordingly, Thunderbolt asserts that SHPA's procedure denied Thunderbolt its constitutionally guaranteed right of due process.

On May 20, 1998, the superior court reversed the board upon concluding, without written analysis: "After reviewing all of the briefs, citations, evidence, and authority submitted, the Court finds that the decision of the State Health Planning Board to grant the Certificate Of Need to St. Joseph's is improper."

We granted SHPA's and St. Joseph's applications to appeal. They contend the court exceeded the limited scope of review authorized as to final agency decisions, erred by reweighing the evidence, failed to accord due deference to SHPA's interpretations of SHPA's own rules, failed to make required findings, failed to find that Thunderbolt waived its arguments below, and erred in reversing the Review Board's decision.

1. The trial court was authorized to reverse or modify the Review Board's final decision only if substantial rights of Thunderbolt had been prejudiced because the procedures or the final decision of the administrative process violated constitutional or statutory provisions, exceeded SHPA's authority, resulted from unlawful procedures, were affected by other error of law, were not supported by substantial evidence, or were arbitrary or capricious or otherwise abusive of discretion.[2] Appellants contend reversal is warranted because the court failed to make one of the required findings but merely concluded the decision "was improper."

Under the Administrative Procedure Act, which is specifically

[2] OCGA § 31-6-44 (m).

made applicable through OCGA § 31-6-44 (m),

> [w]henever a superior court judge is required by law to make certain findings in order to return a verdict [sic], the presumption is that he has made the required findings, absent a showing to the contrary. This presumption applies even if the required findings are not specifically set out in the order. [Cit.][3]

Accepting such, this Court must go on and "determine whether the judge of the superior court has in his own final ruling committed an error of law."[4] Accordingly consideration must be given to the issues raised by Thunderbolt in its appeal to the superior court.

2. The SHPA rule which precipitated projection of an 11-bed unmet need in Chatham County was in the part of SHPA's rules entitled "Skilled Nursing and Intermediate Care Facilities."[5] That section projects unmet need for "nursing home" beds,[6] and "nursing home" is defined as follows: " 'A nursing home' is a long-term facility. . . . A nursing home may be licensed as a skilled nursing facility, an intermediate care facility, or an intermingled facility." No definition is given for "long-term," no precise time period is set, and the rule does not mention subacute care.

SHPA is the state agency chartered to administer the certificate of need program and to adopt rules and procedures to administer its functions.[7] SHPA's authority to create rules and procedures is limited by the statutes that establish it, and SHPA is "not authorized to enlarge the scope of, or supply omissions in, a properly-enacted statute."[8]

By statute, certificates of need are required for "new institutional health services or health care facilities."[9] The meaning of "new institutional health service" includes construction, development, or other establishment of a new "health care facility."[10] The definition of health care facility is broad and includes, among others, "skilled nursing facilities":[11]

---

[3] *Burson v. Collier*, 226 Ga. 427, 428 (1) (a) (175 SE2d 660) (1970) (judicial review under Administrative Procedure Act).

[4] *DeWeese v. Ga. Real Estate Comm.*, 136 Ga. App. 154, 155 (1) (220 SE2d 458) (1975) (appellate review of superior court decision on appeal of an administrative procedure).

[5] Former SHPA Rule 272-2-.09 (9).

[6] Former SHPA Rule 272-2-.09 (9) (b) 1.

[7] OCGA § 31-6-21.

[8] *North Fulton Med. Center v. Stephenson*, 269 Ga. 540, 543 (501 SE2d 798) (1998).

[9] OCGA § 31-6-40 (a).

[10] OCGA § 31-6-2 (14).

[11] OCGA § 31-6-2 (8).

"Skilled nursing facility" means a public or private institution or a distinct part of an institution which is primarily engaged in providing inpatient skilled nursing care and related services for patients who require medical or nursing care or rehabilitation services for the rehabilitation of injured, disabled, or sick persons.[12]

There is no definition for "nursing home" in the enabling statutes.

In short, SHPA is required by law to establish rules and regulations for issuing CONs for new skilled nursing facilities as defined in OCGA § 31-6-2 (22). In developing its rules SHPA is also required to implement applicable parts of the state health plan.[13] For instance, one consideration for granting a CON is determining whether "[t]he proposed new institutional health services are reasonably consistent with the relevant general goals and objectives of the state health plan."[14] The state health plan is adopted by the Governor's Health Strategies Council and approved by the Governor.[15] The component of the state health plan applicable to the rules governing nursing homes is entitled "Component Plan — Long-Term Care: Nursing Homes," and a certified copy was introduced as an exhibit.

Thunderbolt contends that because St. Joseph's offers subacute care it is not offering to provide a "nursing home" as defined in the rules. Despite St. Joseph's characterization of the type of service to be provided as "subacute," St. Joseph's proposed beds constitute skilled nursing beds as defined in OCGA § 31-6-2 (22) and in SHPA's rules.

A health planning expert gave unrebutted testimony explaining that subacute care is care provided to patients who no longer warrant placement in an acute care hospital bed but still need more extensive nursing services than are generally available in a traditional nursing home. The expert further testified that subacute care is consistent with a specific objective of the Component Plan, which provides: "Services provided on a skilled care level to those who require extended care post-hospitalization and more intensive skilled care." He also testified that subacute care is only a subset of "skilled nursing" care.

The director of the regulatory review division of SHPA testified that for the agency's purposes subacute is merely skilled care. "The interpretation of a statute by an administrative agency which has the duty of enforcing or administering it is to be given great weight

---

[12] OCGA § 31-6-2 (22).
[13] OCGA § 31-6-21 (b) (1).
[14] OCGA § 31-6-42 (a) (1).
[15] See OCGA § 31-6-21; former SHPA Rule 272-2-.08 (2) (a) 1.

and deference. [Cits.]"[16] Thunderbolt offers no authority for a different conclusion.

*HCA Health Svcs. of Ga. v. Roach*[17] is inapposite. There SHPA interpreted one of its rules in such a way as to exceed the power granted to it by the legislature.[18] Here, the enabling statute encompasses all skilled nursing facilities, and it is Thunderbolt who attempts to argue that SHPA's rules do not cover a subset of that category. Construction of the relevant statutes, the Component Plan and SHPA rules, together with expert testimony and SHPA's own opinion of the meaning of its rules leads to the inescapable conclusion that although St. Joseph's characterized the services that it was offering as "subacute" they fall within the definition of "skilled nursing."

St. Joseph's projected that a patient's average length of stay would be 15 days at the proposed facility. Thunderbolt contends that this disqualifies St. Joseph's because the unmet need is for beds in nursing homes which are "long-term" beds. There is no definition for "long-term" in the "Skilled Nursing and Intermediate Care Facilities" section of SHPA's rules. Thunderbolt points to a separate section of SHPA's rules entitled "Short-Term Hospital Beds" which defines "short-stay hospitals" as those with an average length of stay of less than 30 days.[19] Thunderbolt asserts that by negative implication "long-term" as used in the "Skilled Nursing and Intermediate Care Facilities" section must mean average length of stay of 30 days or greater.

The definition of "nursing home" in SHPA Rule 272-2-.09 (9) (a) 1. is identical to the definition found in the Component Plan, including the word "long-term." Page one of the Component Plan, the introductory background section on "Long-Term Care Planning" states:

> Long-term care is defined as the personal or professional services that are required on a recurrent or continuous basis by an individual because of chronic or permanent physical or mental impairment. The services may be provided in a variety of settings, including the client's own home. The purpose of long-term care services is to relieve the effects of illness,

---

[16] *Hosp. Auth. of Gwinnett County v. State Health Planning Agency*, 211 Ga. App. 407, 408 (2) (438 SE2d 912) (1993). Accord *Atlanta Journal &c. v. Babush*, 257 Ga. 790, 792 (2) (364 SE2d 560) (1988) ("in construing administrative rules, 'the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the (rule),'" quoting *United States v. Larionoff*, 431 U. S. 864, 872 (97 SC 2150, 53 LE2d 48) (1977)).

[17] 265 Ga. 501 (458 SE2d 118) (1995).

[18] Id. at 502-503 (2).

[19] See former SHPA Rule 272-2-.09 (8) (b).

and to maintain or enhance functional capacities that maximize personal independence.

(Footnotes and punctuation omitted.) This definition includes no reference to the average length of stay necessary to qualify as a "long-term" facility.

The state health plan is a comprehensive program designed "for the purpose of providing adequate health care services and facilities throughout the state."[20] It seeks to maximize utility out of existing health care facilities and create a dynamic and responsive environment for those seeking medical care.[21] An objective of the plan is to provide a level of skilled care to those people who require extended care post-hospitalization and more intensive skilled care. One standard found in the plan for providing these services is that: "permanent conversion of existing underutilized acute care hospital beds to skilled or intermingled beds will receive more favorable consideration to meet identified need. . . ." The same standard is in SHPA's rules.[22] Rationale for converting hospital beds to long-term care nursing home beds includes that "[t]he effects of reimbursement policies and changing hospital use patterns have resulted in underutilization of some hospital beds." Further:

> While hospitals are responding to the acute-care needs of community residents, some hospitals indicate that they are experiencing increasing difficulty in placing patients who need longer term care. Alternatives to expensive acute-care services should be available to provide other appropriate settings for the patients who need long-term care.

Based on the enabling statutes, the state health plan, SHPA's rules, and the testimony regarding SHPA's interpretation of its own rules, it is clear that the beds offered by St. Joseph's fit the definition of nursing home beds in SHPA's rules.

"Short-stay hospital" in the rules is a different category of health care. SHPA Rules 272-2-.09 (1) through 272-2.09 (20) establish standards and criteria for awarding CONs for 20 different categories of health care, for example: category 1 — "Ambulatory Surgical/Obstetrical Services"; category 2 — "Radiation therapy"; category 3 — "Magnetic Resonance Imaging." Category 8 is "Short-Term Hospital Beds," and category 9 is "Skilled Nursing and Intermediate Care Facilities." No one contends that category 8 governs issuance of a

---

[20] OCGA § 31-6-2 (23).
[21] OCGA § 31-6-1.
[22] Former SHPA Rule 272-2-.09 (9) (b) 1. (iii).

nursing home CON. Rather, Thunderbolt contends it should control the definition of "long-term" as used in category 9.

Nothing in the rules supports Thunderbolt's argument. Short-stay hospital beds are not related to the Component Plan for long-term care, which is the component plan applicable to category 9. The definition of "short-stay hospital" does not override the consistent treatment of "skilled nursing" and "nursing home" in the Component Plan, the enabling statutes or SHPA rules.[23]

Finally, Thunderbolt did not challenge in the superior court the Review Board's finding on the merits that St. Joseph's application better fit the unmet need. Nor does it appear from the court's order that it reweighed the evidence or determined that the Review Board's decision was not supported by substantial evidence.[24] It ruled only that the award to St. Joseph's was improper. But the Review Board's final decision was not infected by any error of law or other prejudice to Thunderbolt's rights as described in OCGA § 31-6-44 (m), for any of the reasons raised by Thunderbolt in its appeal for judicial review.

The remaining enumerations of error are moot.

*Judgment reversed. Blackburn, J., concurs. Barnes, J., concurs in judgment only.*

DECIDED APRIL 1, 1999.

*Parker, Hudson, Rainer & Dobbs, John H. Parker, Jr., Thomas D. Watry*, for appellant (case no. A99A0065).

*Thurbert E. Baker, Attorney General, Brenda H. Cole, Robert S. Bomar, Deputy Attorneys General, Harold D. Melton, Senior Assistant Attorney General, William W. Calhoun, Assistant Attorney General*, for appellant (case no. A99A0066).

*Jack R. Hancock*, for appellee.

---

[23] See *Hosp. Auth. of Gwinnett County*, supra, 211 Ga. App. at 408 (2) (rules not inconsistent or in conflict; agency interpretation prevails).

[24] OCGA § 50-13-19 (h) ("The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact."). Accord *Hosp. Auth. of Gwinnett County*, supra, 211 Ga. App. at 409-410.