A01A0710, A01A0711. BOARD OF NATURAL RESOURCES v. GEORGIA EMISSION TESTING COMPANY; and vice versa.
(548 SE2d 141)

BARNES, Judge.

This appeal addresses the authority of the Georgia Board of Natural Resources ("Board") to promulgate certain regulations implementing the Georgia Motor Vehicle Emission Inspection & Maintenance Act ("I/M Act"), OCGA § 12-9-40 et seq. Georgia Emission Testing Company ("GETCo") challenged two regulations, one restricting mobile emission testing, and one assessing administrative fees for each vehicle inspection performed. We reverse the superior court's decision reversing the administrative law judge ("ALJ") and holding that the mobile test restrictions are invalid and affirm the superior court's decision affirming the ALJ and holding that a portion of the assessed fees are invalid.

GETCo petitioned the Office of State Administrative Hearings for a hearing,[1] contending that Board Rule 391-3-20-.09 (2) (c), limiting mobile testing to fleet and dealership vehicles at locations and times listed on a submitted schedule, violates the I/M Act.

GETCo also challenged Board Rule 391-3-20-.21 (3) (a), which assesses an administrative fee for each inspection, a portion of which is paid to an independent contractor for "program management services." GETCo sought a ruling declaring that the restrictions on mobile testing were unauthorized and unenforceable, the Board's actions were arbitrary and capricious, the administrative fee rule was void, and all unauthorized administrative fees should be refunded.

The ALJ initially found on November 4, 1998, that the Board's actions in promulgating both regulations were not "unauthorized, unenforceable, arbitrary or capricious." GETCo petitioned the Superior Court of Fulton County for review, and the Board moved to dismiss the petition, arguing that GETCo no longer had standing to challenge the regulations because it had sold its assets. GETCo responded that it maintained standing because it sought a refund of fees paid and because, if the mobile test restrictions were lifted, it planned to lease related software to other operators.

The superior court denied the motion to dismiss. It also reversed the Board's decision approving the mobile test restrictions, holding that the regulations violated the clear language of the I/M Act.

Next, the court reversed and remanded the management fee issue to the ALJ for further factfinding. Construing the language of OCGA § 12-9-46 (a) (11), the court held that "the legislature intended that . . . the fee is to be limited to that amount necessary to perform required and adequate oversight to confirm that tests are being performed in a proper and adequate manner." The court directed the ALJ to make findings of fact regarding which of the various tasks to which the fee is allocated were necessary for oversight. On remand, the ALJ found that two of the six tasks to which the fee was allocated were not necessary for oversight.

Both the Board and GETCo petitioned the superior court for review of the ALJ's order on remand. The superior court affirmed the ALJ's findings of fact and conclusions of law regarding the $5.45

---

[1] OCGA § 12-9-53 was amended effective April 23, 1998, to provide that review of a director's decision would proceed under the Administrative Procedure Act. OCGA § 50-13-10 provides that a challenge to the validity of a rule shall be brought as a declaratory judgment action in superior court. Because this action was instituted before OCGA § 12-9-53 was amended, GETCo properly sought a hearing before the Office of State Administrative Hearings.

administrative fee, and both parties have cross-appealed to this court.

### Case No. A01A0710

1. The Board asserts that the superior court erred in concluding that GETCo had standing to pursue judicial review, because it had sold its assets effective January 1, 1999, and thus was not "aggrieved" by the ALJ's final decision. GETCo responds that it was "aggrieved" because it retained an economic interest in future emission tests, it sought a refund of a portion of the testing fees it already had paid, and it planned to market certain software if the mobile testing restrictions were lifted.

OCGA § 50-13-19 (a) provides that "[a]ny person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter." "In the context of the Administrative Practice Act, the word 'aggrieved' has been interpreted to mean that the person seeking to appeal must show that he has an interest in the agency decision that has been specially and adversely affected thereby." (Citation omitted.) *Ga. Power Co. v. Campaign for a Prosperous Ga.*, 255 Ga. 253, 257 (2) (336 SE2d 790) (1985). "[O]ne who suffers or will suffer economic injury as the result of an administrative decision may be considered aggrieved for purposes of obtaining judicial review of the decision." *Chattahoochee Valley Home Health Care v. Healthmaster,* 191 Ga. App. 42, 43 (1) (a) (381 SE2d 56) (1989).

GETCo has presented evidence that it suffers or will suffer economic injury as a result of the Board's regulations assessing fees against emission testers and restricting mobile testing. The trial court did not err in denying the Board's motion to dismiss.

2. Under the Administrative Procedure Act, the administrative agency's findings are judicially reviewable if they are "[c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record." OCGA § 50-13-19 (h) (5). Our courts have held that the "clearly erroneous" and "any evidence" standards of review on factual issues are synonymous and that the superior court cannot substitute its judgment for that of the ALJ as to the weight of the evidence on questions of fact. *Emory Univ. v. Levitas,* 260 Ga. 894, 898 (1) (401 SE2d 691) (1991). "[O]n appeal our duty is not to review whether the record supports the superior court's decision but whether the record supports the initial decision of the local governing body or administrative agency. . . ." Id.

As to questions of law, under OCGA § 50-13-19 (h) (2), the superior court may reverse or modify the decision if substantial rights of

the appellant have been prejudiced because the administrative decision exceeds the agency's statutory authority. In such cases, our function is to determine whether the superior court has in its own final ruling committed an error of law. *Deweese v. Ga. Real Estate Comm.*, 136 Ga. App. 154, 155 (1) (220 SE2d 458) (1975).

3. The Board contends that the superior court erred in reversing the ALJ and invalidating the rule restricting mobile testing for vehicles owned by members of the public. The superior court held that the rule exceeded the agency's statutory authority, set out in OCGA § 12-9-49 (c):

> The board shall not in any manner limit the number, location, and types of authorized inspection stations certified to operate in any nonattainment area [(counties that do not meet federal air pollution guidelines)], county, or any portion of a county or area. In no event shall the board enter into any contract or into a series of contracts the effect of which will be the realization of centralized testing.

The Board's regulation at issue provides as follows:

> Mobile test stations — EPD will permit the licensing of mobile test stations for the purpose of testing fleet and car dealer vehicles at locations which are not licensed as fleet stations. Mobile test stations must meet the same requirements as regular test stations with the following exceptions: . . . 3) Mobile test stations are not permitted to test vehicles except those owned or operated by the fleet or dealer location where the testing is performed. Mobile test stations are not allowed to set up locations to test vehicles for the general public. However, station owners may obtain a certificate allowing the test system from a regular test station to perform mobile testing of fleet and dealer vehicles during off hours, provided that the regular test station is operated at all times during its posted hours.

Rules and Regs. of Georgia Department of Natural Resources ("DNR"), Environmental Protection Division ("EPD"), Rule 391-3-20-.09 (f).

In his conclusion of law upholding the rule, the ALJ found that the legislature intended to prevent the Board from taking actions that "would result in the evil of 'centralized testing,'" or impose geographical or numerical limits on the certificates issued. The ALJ explained his reasoning as follows:

> The term "centralized testing" obviously refers to a situation which exists when residents in some geographical sections

within the nonattainment area are forced to drive considerable distances to have their vehicles tested because testing stations are clustered in a few central areas and are not distributed widely in every part of the nonattainment area. In enacting OCGA § 12-9-49 (c) the legislature obviously wanted to ensure that the Board did nothing to encourage such centralized testing by placing any geographical limitations or quotas on the approval of applications to conduct emission inspections. The somewhat vague language contained in the first sentence of OCGA § 12-9-49 (c) must be interpreted in accordance with the clear purpose of the statute set forth in the second sentence. Thus it is clear that OCGA § 12-9-49 (c) only prohibits limitations by the Board on the issuance of certificates of authorization which would prohibit applicants from placing as many testing stations of whatever type and at whatever locations within the nonattainment area which they may select. For example, this statute would prohibit the Board from promulgating regulations which would place a numerical quota of six on the issuance of certificates of authorization in the portion of DeKalb County south of Interstate 20 and limit the issuance of certificates of authorization in this portion of DeKalb to regular test stations and to the area around a particular shopping mall. It is clear that the Board by promulgating Rule 391-3-20-.09 (2) (c) imposed none of the geographical limitations prohibited by OCGA § 12-9-49 (c), thus there is no conflict between the regulation and statute as alleged by the Petitioner. There is no limitation in the wording of the regulation on the number of certificates for authorization the Petitioner may obtain, and there also is no limitation on the number or types of emission inspection stations the Petitioner may place in a particular section of the nonattainment area. Requiring the mobile units to adhere to a schedule is not a limitation on the "location" of such units. They are free to travel throughout the nonattainment area. The requirement contained in the regulation that mobile testing units may only test fleet and dealer vehicles is also not a geographical limitation prohibited by OCGA § 12-9-49 (c). In passing this restriction, the Board was not directly restricting mobile testing from taking place in any portion of [the] nonattainment area. This would have been the case if the Board had promulgated a rule, for example, that mobile units may not test fleet and dealer vehicles in south Fulton County. It is true that because mobile units may only test

fleet and dealer vehicles[,] they can, in effect, only operate in areas where such fleet and dealer vehicles are located. This geographical limitation is not one directly imposed by the Board but results from decisions made by the Petitioners['] customers concerning where to locate their businesses.

Because this rule did not impose geographical limits on mobile testers except indirectly by limiting them to their customers' fleet or dealer locations, the ALJ concluded that the rule did not conflict with the statute.

In reversing that conclusion, the superior court held that "[t]he rules and regulations of [the Board] prohibiting mobile test stations from testing public vehicles and limiting such testing to fleet and car dealer vehicles at fleet and car dealer locations violate the clear language of OCGA § 12-9-49 (c)." This paragraph contains the superior court's entire analysis of the mobile testing regulation.

"In construing a statute, the cardinal rule is to glean the intent of the legislature . . . in the light of the legislative intent as found in the statute as a whole." (Citations and punctuation omitted.) *Alford v. Public Svc. Comm.*, 262 Ga. 386, 387 (1) (a) (418 SE2d 13) (1992). Additionally, we must give great weight and deference to the interpretation of a statute by an administrative agency that has the duty of administering it. *Hosp. Auth. of Gwinnett County v. State Health Planning Agency*, 211 Ga. App. 407, 408 (2) (438 SE2d 912) (1993).

The Georgia legislature in OCGA § 12-9-41 embodied findings that the ambient air levels of ozone or carbon monoxide in some counties exceeded the standards set by the federal Clean Air Act, 42 USC § 7401 et seq., as amended. The statute further notes that these excess levels were directly related to motor vehicle emissions and that the state had a duty to provide a plan for reducing the ambient air level of pollutants in order to avoid losing federal funds for sewage treatment plants, transportation projects, and air quality improvement funds. Further, in OCGA § 12-9-42, the legislature declared it to be the public policy of the state to "preserve, protect, and improve air quality" in noncompliant counties, "and to that end to provide a legally enforceable mechanism for the attainment and maintenance of the [National Ambient Air Quality Standards] of such pollutants" by requiring motor vehicles in these counties to be inspected, by inspecting and maintaining emission control equipment, and by inspecting and maintaining on-board diagnostics to ensure compliance with the standards.

It is in light of this preamble that we must consider the statute at issue here. To consider only OCGA § 12-9-49 (c), prohibiting the Board from limiting "the number, location, and types of authorized inspection stations," without considering the statute's purpose and

framework, would be to examine one tree without looking at the forest. The rest of subsection (c) provides: "In no event shall the board enter into any contract or into a series of contracts the effect of which will be the realization of centralized testing."

The federal Environmental Protection Agency's explanation of the federal rules implementing the Clean Air Act defines "centralized testing" as follows:

> Two basic types of inspection networks have existed since the inception of I/M programs. A "centralized" network consists of inspection and retest at high-volume, multi-lane, usually highly automated, test-only stations, run by either a government agency or a single contractor within a defined area. A "decentralized" network consists of inspection and retest at privately owned, licensed facilities, such as gas stations and other shops which may also do repair work. I/M program design is usually determined by elected state or local officials who establish the necessary authorizing legislation.

57 FR 31058.

Georgia has chosen to implement a decentralized testing plan, as evidenced by the language of OCGA § 12-9-49 (c). Additionally, OCGA § 12-9-49 (e) (1) instructs the director to "ensure the operation of such official emission inspection stations of a number, at locations, and in a condition satisfactory to the director and in conformance with all standards, requirements, and specifications prescribed for such inspection stations. . . ."

We must view a statute "to make all its parts harmonize and to give a sensible and intelligent effect to each part." *Houston v. Lowes of Savannah*, 235 Ga. 201, 203 (2) (219 SE2d 115) (1975). In doing so, we will not presume that the legislature intended that any part is without meaning. Id.

Looking at the statute as a whole, we conclude that OCGA § 12-9-49 (c) does not prohibit the Board from issuing rules that prohibit operators from testing the general public using mobile facilities. The superior court erred in reversing the ALJ's well-reasoned conclusion that Rule 391-3-20-.09 (c) was valid, and we reverse that portion of the superior court's order concerning the Board's mobile testing rule.

4. Both parties appeal the superior court's order affirming the ALJ's findings regarding the administrative fee assessed for each inspection made. The Board contends that all of the fee was proper, and GETCo contends that a larger portion of the fee was improper.

OCGA § 12-9-46 (a) (11) authorizes the Board "[t]o prescribe by rule or regulation an administrative fee to be collected by the director

from each emission inspection station in a manner determined by the board by rule or regulation to cover the cost of required and adequate oversight to confirm that inspections are being done in a proper and adequate manner. . . ."

The Board issued a request for proposal and granted the management contract to MCI/WorldCom ("MCI").[2] The Board also promulgated Rule 391-3-20-.21 (3) (a), which provides:

> Each test station shall remit to the Department a program administration fee of $7.40 for each inspection or reinspection for which an emission inspection fee is paid. The Department shall remit five dollars and forty-five cents ($5.45) of each paid fee to the Management Contractor for providing program management services associated with implementation of the program. The Department shall remit one dollar ($1.00) of each paid fee to the appropriate county governing authority for each responsible motor vehicle that is registered in that county. Ninety-five cents ($0.95) of each paid fee shall be remitted to the Department to cover the costs of providing oversight and other services needed for the implementation of the program.

At issue in this appeal is the $5.45 fee paid to MCI, allocated as follows: Task 1 — $1.58 to design, build, operate, and maintain a data system and network; Task 2 — $0.78 to conduct audits and quality assurance and control of emission inspection stations; Task 3 — $1.43 to establish and conduct a public information program; Task 4 — $0.79 for inspector training and station and inspector licensing; Task 5 — $0.84 to cover the cost of issuing waivers, exemptions, and extensions and overseeing the referee program; and Task 6 — $0.03 to close out the previously existing inspection and maintenance program.

The ALJ found that tasks three and six, involving the public information campaign and closing out the old system, were not related to oversight or management. Therefore, the ALJ concluded, only that portion of the $5.45 allocated to the remaining four tasks, or $3.99, was "necessary to cover the cost of required and adequate oversight to confirm that inspections are being done in a proper and adequate manner."

The Board argues that tasks three and six constitute "required and adequate oversight" within the statutory authority of OCGA

---

[2] The inspection and maintenance program involves a great deal of data that flows from the individual test sites to a centralized database, where it is used for record-keeping, comparisons, and audits, among other things.

§ 12-9-46 (a) (11).

(a) As to task three, the Board argues that implementation of an adequate public information program "is part of required and adequate oversight, because the driving public must know how and when to get inspections and persons and businesses must be informed of the requirements to become inspection stations so that a sufficient number of stations are certified to perform inspections." GETCo responds that evidence in the record supports the ALJ's conclusion that task three was not necessary for compliance oversight. After reviewing the evidence, the ALJ found that "[t]he public information campaign program is not intended to be, nor is it used as, a compliance oversight tool. This task involves not verification that emission inspections are being done properly, but mainly is an advertising, public relations and education campaign."

We will affirm the superior court's affirmation of the ALJ's factual findings if the administrative record contains any evidence to support them. *Emory Univ. v. Levitas*, supra, 260 Ga. at 898. Marlin Gottschalk, program manager of the Mobile & Area Sources Program of the Air Protection Branch, EPD, DNR, explained that the public information program was designed to raise consumer awareness about the program, provide information to consumers and businesses, and gather complaints about emission testers that may lead to audits, among other things. We conclude that the record contains evidence to support the ALJ's factual finding that task three is not necessary to confirm that inspections are being done properly and affirm the superior court's order affirming that finding.

(b) The Board argues that the superior court erred in affirming the ALJ's finding of fact that task six, closing out the old inspection system, was not necessary to cover the cost of required oversight.

Program manager Gottschalk explained that MCI managed the previous inspection program from June 1996 through September 1996, then closed out that program to make way for the current one. Three cents of the $5.45 was allocated over the life of MCI's contract to cover this expense.

The ALJ found that "[t]he intent of task six is the transition from the old to the new program and is not directly related to oversight activities to confirm that testing under the new program is being done properly." We find that the evidence supports the ALJ's finding and affirm the superior court's order in that regard.

*Case No. A01A0711*

(c) GETCo argues in Case No. A01A0711 that the superior court erred in affirming the ALJ's finding that task one, $1.58 to design, build, operate, and maintain a data system and network, was neces-

sary for oversight and within the Board's statutory authority.

Based on evidence from program manager Gottschalk and a quality control manager with MCI's subcontractor, the ALJ found that "[t]he data system and network are the central nervous system of the program, providing for the transfer of data between vehicle emission inspection test systems and EPD's central data base, maintained by MCI." The ALJ went on to outline the various ways the data system and network allowed the program to operate and detect "potentially improper or fraudulent vehicle testing."

We conclude that the record contains evidence to support the ALJ's factual finding that task one is necessary to confirm that inspections are being done properly and affirm the superior court's order affirming that finding.

(d) Finally, GETCo argues that the superior court erred in affirming the ALJ's finding that task five, $0.84 to cover the cost of issuing waivers, exemptions, and extensions and overseeing the referee program, was necessary for oversight and within the Board's statutory authority.

Citing two affidavits of record, the ALJ found that

[t]he waivers, exemptions, and extensions component of this task consists of procedures that provide relief from regular program requirements for qualified vehicle owners. These are verification activities because MCI is corroborating through the use of objective data that the proper waivers, exemptions and extensions are being issued to those entitled to them. This task is necessary to confirm that inspections are being done in a proper and adequate manner because without these activities it would be impossible to determine whether or not or when a particular vehicle is subject to regular testing procedures or qualifies under the I/M Rules for a waiver, extension or exemption. In addition, the other component of this task, the performance of referee tests upon receipt of a complaint from the public to verify the accuracy or validity of a particular emission inspection, is clearly necessary to confirm that the inspections are being done in a proper and adequate manner.

We conclude that evidence supports the ALJ's finding and affirm the superior court's order affirming the ALJ's finding that task five was necessary.

*Judgment affirmed in Case No. A01A0711. Judgment affirmed in part and reversed in part in Case No. A01A0710. Smith, P. J., and Phipps, J., concur.*

DECIDED MAY 2, 2001 —
RECONSIDERATION DENIED JUNE 4, 2001 

*Thurbert E. Baker, Attorney General, Robert S. Bomar, Deputy Attorney General, Isaac Byrd, Senior Assistant Attorney General, Diane L. Deshazo, Timothy J. Ritzka, Assistant Attorneys General,* for appellant.

*Long, Aldridge & Norman, James D. Dantzler, Jr., John P. Hutchins, Jill C. Kuhn,* for appellee.