A02A1160. DEPARTMENT OF COMMUNITY HEALTH
v. FREELS.
(576 SE2d 2)

RUFFIN, Presiding Judge.

James Freels suffers from a severe form of cerebral palsy. On September 3, 1999, the then five-year-old Freels, through his parents and a treating physician, petitioned the Georgia Department of Community Health (the "Department") seeking reimbursement under Medicaid for his hyperbaric oxygen therapy ("HBOT"). After the Department denied his petition, Freels requested a hearing before an administrative law judge ("ALJ"). The ALJ upheld the Department's refusal to reimburse Freels, and the Department then issued a final decision denying Medicaid coverage for Freels' HBOT. Freels appealed to the superior court, which reversed the Department's final decision. We granted the Department's application for a discretionary appeal, and for the reasons set forth below, we affirm in part, reverse in part, and remand the case to the superior court.

"[O]n appeal our duty is not to review whether the record supports the superior court's decision but whether the record supports the initial decision of the local governing body or administrative agency. . . ."[1] Our function "is to determine whether the . . . superior court has in [its] own final ruling committed an error of law."[2]

[1] *Emory Univ. v. Levitas*, 260 Ga. 894, 898 (1) (401 SE2d 691) (1991).
[2] *DeWeese v. Ga. Real Estate Comm.*, 136 Ga. App. 154, 155 (1) (220 SE2d 458) (1975).

The "any evidence" standard applies to the superior court's review of the findings of fact of the ALJ.[3]

The record shows that Freels' parents aggressively sought treatment for his cerebral palsy. Freels underwent two years of occupational therapy, speech therapy, and physical therapy and then began a series of assisted movement exercises referred to as "patterning." In February 1999, shortly after Freels turned five, his parents learned of HBOT from a volunteer who had assisted with Freels' patterning exercises. Freels' family arranged for a series of 42 treatments using HBOT.

Norman Harbough, Freels' physician, submitted a request to the Department for reimbursement for the costs of Freels' HBOT from Medicaid. In a November 30, 1999 letter to Harbough, the Department denied the request, explaining that "[o]ur physician panel has determined that HBOT in Cerebral Palsy is experimental/investigational and is not a generally accepted practice at this time." Harbough asked for reconsideration, but the Department upheld the denial because there was "no scientific data to support the medical necessity for HBOT in this case."

After the Department's medical review decision, Freels asked for an administrative hearing. At the hearing, Freels presented the testimony of Dr. Paul Harch and his father David Freels. Dr. Harch is a board-certified physician in the field of hyperbaric medicine. Dr. Harch also has extensive experience in using a brain blood flow imaging technique known as a SPECT scan. SPECT is an acronym for single photon emission computed tomography, which is a functional image of the blood flow in the brain. Dr. Harch admitted, however, that the use of SPECT scans as a reliable source of objective data is in dispute.

According to Dr. Harch, HBOT involves enclosing the patient's body in a pressurized vessel containing pure oxygen, which causes an increase in the amount of oxygen dissolved in the patient's blood. Dr. Harch explained his theory behind the effective use of HBOT in treating cerebral palsy. After the brain is damaged in patients with cerebral palsy, Dr. Harch testified, some brain cells may become idle. The delivery of more oxygen to the damaged area may encourage growth of blood vessels and thus restore function to the cells. This theory, Dr. Harch concluded, is consistent with his review of SPECT scans generally showing more normal or increased brain blood flow in patients who have undergone a series of HBOT treatments.

Dr. Harch performed a neurological exam on Freels. He looked at Freels' SPECT scan brain images taken before HBOT and those

---

[3] *Emory Univ.*, supra.

taken after a number of treatments. The images showed a "genera-
lized improvement in the flow, but specifically . . . in the general
regions of his speech motor area." Dr. Harch noted that the difference
in the two scans shows a change from an asymmetric to an even dis-
tribution in the brain blood flow. Dr. Harch was impressed with the
difference in images given the improvement in Freels' speech. Dr.
Harch testified that HBOT was safe and effective.

James Carroll, a board-certified neurologist specializing in child
neurology, was called as a witness by the Department. Dr. Carroll
testified that there was no biological reason why HBOT would cause
cells to develop in the brain where they were not surviving. He also
stated his opinion that SPECT scans only showed blood flow in the
brain and could not be related to function. Dr. Carroll testified that
even though there may have been evidence of improvement in Freels'
condition during the HBOT, the improvement could not necessarily
be attributed to the HBOT. He further testified that he had no reason
to believe the HBOT would correct or ameliorate any of Freels' medi-
cal problems and that HBOT was not an acceptable standard of
treatment for children with cerebral palsy.

The Department also called child neurologist Frank Berenson,
who testified that it has not been established that HBOT is medically
beneficial for the treatment of children with cerebral palsy. He cor-
roborated Dr. Carroll's testimony that SPECT scans do not measure
the functional activity of the brain, and he stated his opinion that it
was medically implausible that HBOT could change the injury to the
brain caused by cerebral palsy. Based upon this, and other evidence,
the Department decided that it would not reimburse Freels for the
treatment.

1. The superior court reversed the Department's final decision
because it was affected by error of law.[4] Specifically, the superior
court found that the Department applied the wrong legal standard by
focusing on whether HBOT was an accepted treatment that was
medically necessary. According to the superior court, the proper
inquiry was whether HBOT was necessary "to correct or ameliorate a
physical or mental defect or condition" regardless of whether it is an
accepted medical practice. The Department contends the superior
court erred in finding that the legal standard used by the Depart-
ment in reaching its final decision failed to comport with Medicaid
requirements. We disagree.

The General Assembly has designated the Department as the
agency authorized to adopt and administer the plan for medical

---

[4] See OCGA § 50-13-19 (h) (4).

assistance under the federal Medicaid program.[5] Medicaid is

> a cooperative venture of the state and federal governments.
> A state which chooses to participate in Medicaid submits a
> state plan for the funding of medical services for the needy
> which is approved by the federal government. The federal
> government then subsidizes a certain portion of the finan-
> cial obligations which the state has agreed to bear. A state
> participating in Medicaid must comply with the applicable
> statute, Title XIX of the Social Security Act of 1965, as
> amended, 42 U.S.C. § 1396, et seq., and the applicable regu-
> lations.[6]

"The interpretation of a statute by an administrative agency which
has the duty of enforcing or administering it is to be given great
weight and deference."[7] Nevertheless, the Department must comply
with the applicable federal law,[8] and, having chosen to participate in
the Medicaid program, the State must provide the services required
under the program.[9]

Federal law governing the Medicaid program provides that eligi-
ble recipients under the age of 21 are entitled to early and periodic
screening, diagnostic, and treatment ("EPSDT") services.[10] Specifi-
cally, 42 USC § 1396d (r) (5) provides that EPSDT services include:
"Such other necessary health care, diagnostic services, treatment,
and other measures . . . to correct or ameliorate defects and physical
and mental illnesses and conditions discovered by the screening ser-
vices, *whether or not such services are covered under the State plan.*"[11]
The parties agree that Freels is eligible for EPSDT services.

In its final decision, the Department noted that it "reimburses
only for services which are medically necessary and within accepted
professional standards." The Department also recited the definition
of medically necessary services found in its policies and procedures
manual:

> Medically necessary services are those services which are
> reasonable and necessary in establishing a diagnosis and
> providing palliative, curative or restorative treatment for

---

[5] See OCGA § 49-4-142 (a).

[6] *Harris v. James*, 127 F3d 993, 996 (1) (11th Cir. 1997).

[7] (Citation and punctuation omitted.) *St. Joseph's Hosp. v. Thunderbolt Health Care,*
237 Ga. App. 454, 457-458 (2) (517 SE2d 334) (1999).

[8] *Silver v. Baggiano*, 804 F2d 1211, 1215 (11th Cir. 1986).

[9] See *Tallahassee Mem. Regional Med. Center v. Cook,* 109 F3d 693, 698 (11th Cir.
1997).

[10] 42 USC § 1396 (a) (4) (B).

[11] (Emphasis supplied.)

physical and/or mental health conditions. Services meeting professional standards are those which, in the opinion of [a] recognized peer, under usual circumstances contributed to a satisfactory outcome in the health status of the recipient. The services provided, as well as the type of provider and setting, must be appropriate to the specific medical needs of the recipient; and there must be no other equally effective, more conservative or substantially less costly course of treatment available. The determination of medical necessity shall be made in accordance with currently accepted standards of medical practice.

The Department denied Medicaid coverage to Freels because it found that, "[b]ased upon the evidence presented, Petitioner failed to satisfy the requisite burden of proof that HBOT treatments are an acceptable standard of medical practice and has not proven that HBOT is medically necessary for Petitioner."

The Department contends that its core standard for reimbursement, "palliative, curative or restorative treatment," is not necessarily at odds with the language of 42 USC § 1396d (r) (5), and that it is free to promulgate rules for the application and administration of the Medicaid program so long as the rules are consistent with the Medicaid program.[12] The findings of the Department, however, refer to Freels' failure to establish HBOT as "medically necessary," a term defined at length in the quoted excerpt from the policies and procedures manual, indicating that the Department based its decision on its manual and not the applicable federal statute. And, even if we assume that medical services which provide "palliative, curative or restorative treatment," are functionally the same as medical services which "correct or ameliorate defects and physical and mental illnesses and conditions,"[13] the federal statute does not require that a treatment" also be "an acceptable standard of medical practice" to be eligible for reimbursement.[14] As the superior court ruled, "[i]nstead of requiring proof that HBOT is the accepted standard medical practice, or that it meets the definition of medical necessity reserved for adult Medicaid recipients, the [Department] should have focused its inquiry on whether HBOT was necessary to correct or ameliorate [Freels'] physical condition." The Department's findings show that

---

[12] See *ABC Home Health Svcs. v. Ga. Dept. of Med. Assistance*, 211 Ga. App. 461, 463 (439 SE2d 696) (1993).

[13] 42 USC § 1396d (r) (5).

[14] See generally *Pittman v. Secretary, Fla. Dept. of Health &c. Svcs.*, 998 F2d 887, 891-892 (11th Cir. 1993) (in making its determination that the EPSDT provisions require Florida to provide for a child's organ transplant, the court looked to the plain language of the statute, including the requirements of 42 USC § 1396d (r) (5)).

the proper legal standard was not used in making its reimbursement determination, and we affirm the superior court's reversal of the Department's decision on this basis.

2. The Department also contends the superior court erred in reversing the Department's final decision on the grounds that the Department's findings are "clearly erroneous in view of the reliable, probative, and substantial evidence of record," and requiring the Department to reimburse Freels for his HBOT.[15] We agree.

> Under the Administrative Procedure Act, the administrative agency's findings are judicially reviewable if they are "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." OCGA § 50-13-19 (h) (5). Our courts have held that the "clearly erroneous" and "any evidence" standards of review on factual issues are synonymous and that the superior court cannot substitute its judgment for that of the ALJ as to the weight of the evidence on questions of fact. On appeal our duty is not to review whether the record supports the superior court's decision but whether the record supports the initial decision of the local governing body or administrative agency.[16]

Here, the superior court essentially rejected the testimony of the expert witnesses called by the Department. The superior court found that neither Dr. Carroll nor Dr. Berenson had experience in the approved neurological uses of HBOT "or in the methods upon which treatments can be shown to effect increased brain function," and concluded that these witnesses provided no evidence to refute the testimony showing that HBOT was correcting Freels' cerebral palsy. The superior court further found that the Department erred in giving weight to the testimony of witnesses who were unfamiliar with the medical literature on the use of HBOT on neurological indications and the use of SPECT scan analysis as a diagnostic tool to measure increased brain function. The record shows otherwise.

Dr. Carroll and Dr. Berenson reviewed material concerning the use of HBOT for patients suffering from cerebral palsy. Both doctors testified that SPECT scan analysis does not measure brain function. In Berenson's opinion, it was biologically implausible that HBOT could change the injury to Freels' brain that occurred through his cerebral palsy. The testimony also indicated that any improvement shown by Freels was not necessarily caused by the HBOT.

---

[15] OCGA § 50-13-19 (h) (5).

[16] (Citations and punctuation omitted.) *Bd. of Natural Resources v. Ga. Emission Testing Co.*, 249 Ga. App. 817, 819 (2) (548 SE2d 141) (2001).

The superior court's determination that Dr. Carroll and Dr. Berenson were not qualified to testify about the efficacy of HBOT, and thus could not be relied upon by the Department, is unfounded. It stands to reason that the less utilized and more experimental the medical treatment, the smaller the pool of medical practitioners with any direct experience with the treatment. But that should not make it impossible for the Department to show that an experimental treatment such as HBOT is medically ineffective. Here, the Department chose to present the testimony of medical doctors who had extensive experience in treating cerebral palsy and were familiar with the mechanics of HBOT and the theory behind its application in treatment of brain injury. The trier of fact was entitled to use its discretion in determining whether these witnesses qualified to testify as experts.[17] Doctors Carroll and Berenson demonstrated they were qualified to form an opinion as to the effectiveness of HBOT, and the Department was entitled to rely on their testimony even though it was at odds with the testimony of Dr. Harch.[18] Accordingly, the superior court erred in ruling that the reliable, probative, and substantial evidence showed that HBOT was correcting and ameliorating Freels' condition and in ordering the Department to reimburse Freels for his HBOT.

In sum, because the Department's final decision was affected by error of law, we affirm the order of the superior court reversing the Department's final decision. We nonetheless reverse the ruling of the superior court to the extent that it usurped the role of the factfinder in discounting the testimony of the Department's expert witnesses. We remand the case to the superior court with instructions that the superior court in turn remand the case to the Department for determination of whether, in light of this opinion, Freels is entitled to reimbursement for his HBOT.

*Judgment affirmed in part and reversed in part and remanded with directions. Barnes, J., and Pope, Senior Appellate Judge, concur.*

DECIDED NOVEMBER 19, 2002.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General,*

---

[17] *Droke v. State*, 252 Ga. 472, 474 (2) (314 SE2d 230) (1984).
[18] See *Elbert County Bd. of Commrs. v. Burnett*, 200 Ga. App. 379, 381 (408 SE2d 168) (1991) (Workers' Compensation Board was entitled to base its decision on the testimony of one party's experts over that of the other party's experts).

*Charles E. Hoffecker, Assistant Attorney General*, for appellant.
*Swift, Currie, McGhee & Hiers, Michael Rosetti*, for appellee.